IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TAYLOR TASHIMA, an Individual, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:23-cv-16996 |
| v. | ) ) ) | Judge Mary M. Rowland |
| SHOWROOM GLOBAL, INC., a Delaware Corporation, | ) ) ) ) | Magistrate Judge M. David Weisman |
| Defendant. | ) | |

## AMENDED COMPLAINT

Plaintiff Taylor Tashima ("Tashima" or "Plaintiff"), by and through her attorneys, Williams, Bax & Saltzman, P.C., states as follows for its Complaint against Showroom Global, Inc. ("Showroom" or "Defendant"):

### INTRODUCTION

1. Tashima brings this action against Showroom for violations of the federal Equal Pay Act (the "EPA") 29 U.S.C. § 206(d), the Illinois Equal Pay Act (the "IEPA") 820 ILCS 112/1, for breach of contract, and for violations of the Illinois Human Rights Act (the "IHRA"), 775 ILCS 5/.

### JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over the federal equal pay act claim under the federal Equal Pay Act, 19 U.S.C. § 206(d), *et seq*. pursuant to 28 U.S.C. § 1331. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this district because Defendant conducts business in this district; Plaintiff was employed in this district and the employment contract was executed in this district.

4.      Tashima filed a Charge of Discrimination with the Illinois Department of Human Rights (the "IDHR") on or about December 21, 2023, which was amended on or about January 28, 2024 and she received a right-to-sue notice from the IDHR on or about February 8, 2024. (See Exhibit D hereto).

## FACTUAL BACKGROUND

5.      Plaintiff and Sam Rattner began working together in July 2022 at Vigtory Sportsbook, a sports betting service ("Vigtory").

6.      Plaintiff was one of the first employees hired by Vigtory and she worked closely with Rattner to develop the sportsbook into a successful venture that was purchased by fuboTV in February 2021.

7.      After Vigtory was purchased by fuboTV, Plaintiff and Rattner continued to work together at Fubo Gaming, a spin-off of fuboTV. Rattner resigned in December 2021 and invited Plaintiff to join him in a new, yet to be determined, business venture.

8.      Plaintiff resigned from Fubo Gaming in February and from March 2022 through October 2022, Plaintiff worked with Rattner, without pay, pursuing several potential business ventures. These ventures included an online firearm marketplace, direct-to-consumer cigars, a riverboat casino/entertainment venue, the acquisition of 531 vending machines, and a members only social club in Chicago.

9.      In October 2022, Plaintiff and Rattner jointly decided that they would focus their efforts on developing a tech company designed to give merchants the tools necessary to build an online 3D store. The new business was named "Showroom Global, Inc."

10. After landing on this business idea, Plaintiff and Rattner pitched the concept to Michael Bilstein. After numerous meetings, Bilstein joined the team as the third cofounder and Chief Technology Officer.

11. On November 2, 2022, Plaintiff signed an employment agreement with Showroom. (See Employment Agreement, attached as Exhibit A). Plaintiff's annual salary was set at $110,000, which was significantly less than Rattner's and the Company's other male co-founder, Michael Bilstein, who was brought in after Plaintiff. Plaintiff's title was Vice-President of Business Operations/Marketing.

12 Plaintiff also signed a Restricted Stock Purchase Agreement, which is attached hereto as Exhibit B. According to the terms of the Restricted Stock Agreement, Plaintiff was permitted to purchase 350,000 shares of common stock in Showroom. Plaintiff's male counterparts were provided with significantly more shares than Plaintiff.

13. Per the terms of the Restricted Stock Purchase Agreement, the first 25 % of Plaintiff's shares in Showroom (87,500 shares) was scheduled to vest on November 1, 2023. (See Exhibit A to Restricted Stock Purchase Agreement, which is attached hereto as Exhibit B).

14. At around that time, Showroom established a Board of Directors, which consisted of Rattner, Bilstein, and Chad Stender, an investor from SeventySix Capital. Plaintiff was the only founder left off the Board of Directors and Rattner told Plaintiff at the time that she did not need to be on the Board because her interests were represented by Rattner and Bilstein.

15. Between November 2022 and her termination in October 2023, Plaintiff put her heart into developing Showroom, performing whatever work was necessary to advance the Company. For example, on top of building and operationalizing the full marketing blueprint, Plaintiff played a pivotal role in fundraising efforts, specifically crafting and refining pitch decks

to engage potential investors. These decks underwent multiple iterations, resulting in the creation of over 500 slides.

16. In addition to developing the concept and the vision of the Company alongside Rattner and Blistein, Plaintiff worked directly with UI/UX designers to develop and QA Showroom's user interface, user experience, and copy. In instances when the designer was unavailable, Plaintiff designed the platform wireframes, assisting the Company's front-end developers. For post development sprints, she conducted platform audits, providing essential UX feedback to the front-end team.

17. Plaintiff ultimately performed the above listed tasks twice over because, as in March 2023, Showroom significantly altered its business model, into what eventually evolved into an AI- powered fashion search engine, which is currently the core business model for Showroom.

18. Due in no small part to Plaintiff's contributions, the business model began to attract new, angel investors. Showroom was initially scheduled to be released to the public in August 2023.

19. Despite a postponement of the product launch during that timeframe, Plaintiff continued to work diligently. During the period spanning from August 2023 to her termination in October 2023, Taylor made substantial contributions across various areas within the Company, accomplishing the following tasks:

    (a) <u>Fundraising</u>. Plaintiff crafted the Company presentation for Plug and Play's Brand & Retail Conference at Nike Headquarters in Beaverton, Oregon on September 28, 2023.

    (b) <u>Content.</u> Plaintiff researched and prepared Showroom prompts, conversations, and product results to stage a total of ten (10) demos to generate pre-

4

launch excitement among creators and social media (Plaintiff provided demo storyboards to frontend developer for programming). Plaintiff also selected and directed the coordination of two individuals to create product demo videos and a sample creator video.

(c) <u>Creator Program</u>. Plaintiff established the framework of Showroom's creator program, which consisted of configuring a Discord server, (managing permissions, incorporating bots, creating content), documenting internal controls and workflows for creator onboarding and management, and crafting essential components such as creator applications, legal agreements, and an affiliate link creator. Plaintiff also developed three landing pages for targeted creator outreach to host program overview and application. She also identified 300+ UGC creators for outreach using Storyclash collection based on specific search criteria; and transitioned the creator program from Discord to Airtable after Plaintiff and Rattner decide to adopt a new strategy based on the fact that Discord is ideal for affiliate collaboration while Airtable streamlines creator-focused content collection. This consolidation unified internal and external creator data into a single interface with automated functionalities (internal controls and workflows were updated as well).

(d) <u>Analytics</u>. Plaintiff oversaw the integration of various platforms (ActiveCampaign, Publer, FlexOffers, Airtable) with PowerBI for analytics, directed the creation of dashboard UIs for company, social, affiliate, and creator KPIs, and supervised the development of a comprehensive data dictionary outlining how to interpret the data.

    (e)  <u>Product Testing Launch</u>. Plaintiff orchestrated the launch of product testing by creating automated email sequences and forms for user feedback collection, including the construction and distribution of an email collection form to over 100 family members and friends. Plaintiff also set up an Airtable interface for internal collaboration on product feedback with automated alerts.

    (f)  <u>Direct Email</u>. Plaintiff designed the e-mail templates for transactional e-mails and collaborated with developers for implementation.

    (g)  <u>Tech Stack</u>.  Plaintiff developed proficiency in utilizing various SaaS tools, such as ActiveCampaign, Storyclash, Airtable, Discord, and Sapphire, following comprehensive platform training for each and building expertise from the ground up despite being initially unfamiliar with these platforms.

  20.  Despite being one of the founding members of the Company and contributing greatly to the development and growth of the Company, Plaintiff was unceremoniously terminated on October 25, five days before her shares were scheduled to vest.

  21.  Rattner asked to meet with Plaintiff on Friday, October 20, 2023. At that meeting, Rattner told Plaintiff that because the product launch was delayed and because he could not think of anything productive for Plaintiff to do during the delay, the Board had decided to limit cash burn by placing Plaintiff on a leave of absence with half-pay if Plaintiff also agreed to delay indefinitely the vesting of 25% of her stock shares.

  22.  Plaintiff was completely taken off guard and unable to understand the logic behind the Board's decision that cutting her pay and denying her vesting rights was the most effective solution for curbing cash burn due to the product's launch being delayed.

6

23. Rattner told Plaintiff to take the weekend to think it over. Plaintiff told Rattner that she would think about the proposal, consider all her options, and get back to him with any questions or other ideas she had for limiting the cash burn. Rattner said that was great.

24. At a follow-up meeting with Rattner on Monday, October 23, Plaintiff tried to suggest other reasonable alternatives for limiting cash burn, but Rattner refused to listen. Contrary to the tone he took with Plaintiff on the previous Friday, Rattner told Plaintiff that her only options were either to go on a leave of absence and postpone the vesting of her shares or "leave the Company."

25. On the following day, October 24, Taylor engaged a law firm to help assess her available options. When the firm requested a week to be brought up to speed and develop a response to the proposed leave and delay in vesting, Rattner responded on October 25 by issuing Taylor a termination notice. The termination was abrupt and was never previously discussed as a possibility. Showroom then quickly repurchased all of Taylor's shares of stock for $3.50 just prior to the vesting deadline of November 1.

26. The termination notice, which is attached hereto as Exhibit C, states the reason for Plaintiff's termination as, "Unfortunately, the Company's business needs simply do not require your services, which are currently underutilized and have been for some time."

27. The proffered reason for Plaintiff's termination was pretextual as demonstrated by, among other things, the amount of valuable work that Plaintiff had already completed, particularly after the product launch was delayed in August and because Plaintiff had never received any negative performance reviews or comments on her work from Rattner during the entire time they worked together from July 2020 at Vigtory to October 25, 2023 at Showroom.

## COUNT I
### Equal Pay Act (29 U.S.C. § 206(d)(1))

28. Plaintiff incorporates by reference paragraphs 1-27 as and for her allegations in this paragraph.

29. While she was employed with Showroom, the work that Plaintiff performed was substantially equal to the work performed by her male counterparts in terms of the level of skills, effort and responsibilities that was required for the position.

30. Plaintiff was also performing work under similar working conditions but was paid lower wages and received lower benefits than her male counterparts.

31. Defendant's failure to pay Plaintiff equal wages and benefits violates the Equal Pay Act.

32. Plaintiff suffered damages because of Defendant's unlawful discriminatory actions, including lost wages and benefits and the costs of bringing this action.

33. Defendant willfully violated Plaintiff's rights under the Equal Pay Act, and as a result Defendant is liable for liquidated damages.

**WHEREFORE**, Plaintiff respectfully requests judgment be entered in her favor and that the following relief be awarded:

A. past and future lost wages and benefits, plus interest;

B. liquidated damages incurred in connection with this action, equal to the sum amount of backpay and interest;

C. all costs and reasonable attorneys' fees incurred in connection with this action; and

D. additional or alternative relief as the Court deems just and proper.

## COUNT II
### Illinois Equal Pay Act (820 ILCS 112/)

34. Plaintiff incorporates by reference paragraphs 1-27 as and for her allegations in this paragraph.

35. While she was employed with Showroom, the work that Plaintiff performed was substantially similar to the work performed by her male counterparts in terms of the level of skills, effort and responsibilities required for the position.

36. Plaintiff was also performing work under similar working conditions but was paid lower wages and received lower benefits than her male counterparts.

37. Defendant's failure to pay Plaintiff equal wages and benefits violates the Illinois Equal Pay Act.

38. Defendant acted with malice and reckless indifference to Plaintiff rights under the Illinois Equal Pay Act, and as a result Defendant is liable for compensatory and punitive damages.

**WHEREFORE**, Plaintiff respectfully requests judgment be entered in her favor and that the following relief be awarded:

A. past and future lost wages and benefits, plus interest;

B. compensatory damages;

C. punitive damages;

D. all costs and reasonable attorneys' fees incurred in connection with this action; and

E. additional or alternative relief as the Court deems just and proper.

## COUNT III
### Breach of Contract (Opportunistic Breach)

39. Plaintiff incorporates by reference paragraphs 1-27 as and for her allegations in this paragraph.

9

40. Plaintiff signed an employment agreement with Showroom and one of the elements of Plaintiff's compensation package was the ability to purchase 350,000 shares of restricted stock in Showroom under the terms of a Restricted Stock Purchase Agreement. (Exhibit B).

41. Under the terms of the Restricted Stock Purchase Agreement, the first 25% of Plaintiff's shares in Showroom (87,500 shares) were scheduled to vest on November 1, 2023.

42. Under the terms of the Restricted Stock Purchase Agreement, Showroom was entitled to repurchase any unvested shares of Plaintiff's restricted stock for as low as $0.00001 per share if Plaintiff was no longer employed with Showroom, for any reason, before any of the restricted stock was scheduled to vest.

43. In contravention of the reasonable expectations of the parties when they entered into the employment agreement, Defendant terminated Plaintiff solely to avoid her shares from vesting.

44. The termination was contrary to the reasonable expectation of the parties because the stock shares were offered as an essential component of the compensation Plaintiff was to receive in return for her hard work, lower salary and other sacrifices she made for the Company.

45. Plaintiff performed all work and met all of the obligations required of her based on her employment status.

46. By terminating Plaintiff to prevent her shares from vesting, Showroom breached the implied covenant of good faith and fair dealing, which is present in all contracts, including at-will employment contracts.

47. Plaintiff suffered damages because of Defendant's breach.

**COUNT IV**
**Illinois Human Rights Act**
**(Sex Discrimination and Retaliation)**

48. Plaintiff incorporates by reference paragraphs 1-27 as and for her allegations in this paragraph.

49. While she was employed at Showroom, the work that Plaintiff performed was substantially similar to the work performed by her male counterparts in terms of the level of skills, effort and responsibilities required for the position.

50. Plaintiff was performing work under similar conditions but was paid lower wages, received lower benefits, and was subject to disparate terms and conditions of employment than her male counterparts.

51. Defendant's failure to pay Plaintiff equal wages and benefits and its disparate treatment of Plaintiff violated the Illinois Human Rights Act.

52. Despite her outstanding job performance, Plaintiff was the only one of the three founders whose salary was cut, and whose stock vesting date was delayed indefinitely. When Plaintiff tried to convince Defendant that she should not be the only founding member treated this way, Plaintiff was terminated.

53. Showroom's proffered basis for cutting Plaintiff's salary, indefinitely postponing her vesting rights, and terminating Plaintiff's employment was that her services had been underutilized for some time.

54. Showroom's proffered basis is a pretext. The real basis for the decisions to cut Plaintiff's salary, postpone her vesting rights indefinitely, and terminate her employment was sex discrimination and retaliation for pushing back on Defendant's discriminatory treatment of her.

11

55. Plaintiff suffered damages because of Defendant's unlawful discriminatory and retaliatory actions, including lost wages and benefits and the costs of bringing this action.

**WHEREFORE**, Plaintiff respectfully requests judgment be entered in her favor and that the following relief be awarded:

A. past and future lost wages and benefits, plus interest;

B. compensatory damages;

C. all costs and reasonable attorney's fees incurred in connection with this action:

D. any additional or alternative relief as the Court deems just and proper.

## COUNT V
### Illinois Human Rights Act
### (Disability Discrimination and Retaliation)

56. Plaintiff incorporates by reference paragraphs 1-27 and as for her allegations in this paragraph.

57. Plaintiff suffered from a medical condition caused by a toxic reaction to mold. Plaintiff's condition was unrelated to Plaintiff's ability to perform her job with or without a reasonable accommodation.

58. Plaintiff disclosed her condition to Defendant when she elected to work remotely after flooding caused water damage in Defendant's office.

59. After Plaintiff disclosed her medical condition to Defendant, Defendant advised Plaintiff that her salary was going to be cut and her vesting rights postponed indefinitely.

60. When Plaintiff attempted to convince Defendant that there were other, better options than cutting her salary and postponing her vesting rights, Plaintiff was terminated.

61. Showroom's proffered basis for cutting Plaintiff's salary, indefinitely postponing her vesting rights, and terminating Plaintiff's employment was that her services had been underutilized for some time.

62. Showroom's proffered basis is a pretext. The real basis for the decisions to cut Plaintiff's salary, postpone her vesting rights indefinitely, and terminate her employment was disability discrimination and retaliation for pushing back on Defendant's discriminatory treatment of her.

63. Plaintiff suffered damages because of Defendant's unlawful discriminatory actions, including lost wages and benefits and the costs of bringing this action.

**WHEREFORE**, Plaintiff respectfully requests judgment be entered in her favor and that the following relief be awarded:

A. past and future lost wages and benefits, plus interest;

B. compensatory damages;

C. all costs and reasonable attorney's fees incurred in connection with this action:

D. any additional or alternative relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

Respectfully submitted,

**TAYLOR TASHIMA**

By: /s/: *Kerry E. Saltzman*
   One of Her Attorneys

Kerry E. Saltzman (ARDC # 6191194)
Saltzman@wbs-law.com
Patrick M. Spellman (ARDC # 327634)
Spellman@wbs-law.com
Williams, Bax & Saltzman, P.C.
221 N. LaSalle St. – Suite 3700
Chicago, IL 60601
(312) 372-3311